IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

EquiSolar International, Inc.,                    Case No. 3:10 CV 18

                        Plaintiff,               MEMORANDUM OPINION
                                                 AND ORDER
            -vs-
                                                 JUDGE JACK ZOUHARY
Willard & Kelsey Solar Group, LLC,

                        Defendant.

### INTRODUCTION

This is a contract dispute governed by Ohio law.  Plaintiff Equisolar International, Inc. claims

Defendant Willard & Kelsey Solar Group, LLC breached its duty to pay Plaintiff a $14,900,000 sales

commission and its duty of good faith.  Defendant contends it had no duty to pay the commission,

because the potential sale of solar panels on which the commission was based never happened.

Defendant also contends Plaintiff's bad faith claim is implausible.  Currently pending is Defendant's

Motion to Dismiss pursuant to Federal Civil Rule 12(b)(6) (Doc. No. 7).  Plaintiff filed an Opposition

(Doc. No. 9), Defendant filed a Reply (Doc. No. 10), and the Court held a Hearing on April 20, 2010

(Doc. No. 16).  For the reasons that follow, Defendant's Motion is granted in part and denied in part.

### BACKGROUND

Defendant is an Ohio limited liability company which manufactures and sells solar panels.

Plaintiff is a Florida limited liability company owned and operated by Kay Stripling ("Stripling").

Stripling worked as an independent consultant for Defendant beginning in October 2008, helping

Defendant identify sources of public and private financing. Eventually, Stripling's role included selling Defendant's solar panels to potential customers.

In late 2008, Stripling arranged a potential sale of one-hundred megawatts of solar panels to a European venture, Euro Park I ("Euro Park"). In January 2009, Defendant and Euro Park signed a Term Sheet, which provided that "[t]his draft term sheet shall be used as the term[s] and conditions of a [l]etter of intent to enter into a binding Purchase Agreement between the Seller and Buyer" (Doc. No. 1, Ex. A). The Term Sheet listed the necessary technical specifications for the solar panels, which were to be sold at $2.30 per watt, for a total price of $230,000,000. The Term Sheet also provided that the "[i]nitial deposit [of $13,800,000] will be paid after the visit to [Defendant] by Euro Park I and in February, 2009" (*id.*). Representatives of Defendant and Euro Park signed the Term Sheet in January 2009.

On January 27, 2009, Stripling (through Plaintiff's predecessor-in-interest) entered into a Sales Representative Agreement ("Agreement") with Defendant. The Agreement was reached in principle prior to the signing of the Term Sheet. Under the Agreement, Plaintiff was "entitled to . . . a commission equal to six and one half percent (6.5%) of the sale price for the first 100 Mw of accumulated Products sold by [Plaintiff]" (Doc. No. 1, Ex. B, § 2(a)). The Agreement detailed the method of calculating the commission (*id.*):

> [T]he Commission shall be calculated and paid by [Defendant] to [Plaintiff] on the sales price paid by each [buyer] for Products, and the sales price shall not include any tax, duty, tariff or similar charge imposed upon or added to the sales price. In the event that [Defendant] refunds any portion of the sales price to a [buyer] pursuant to the [Defendant's] typical refund policy . . . , [Plaintiff] agrees to refund on a prorate [sic] basis that portion of the Commission it received from the [Defendant], . . .

The Agreement also described the conditions for payment of commissions, including the commission on the Euro Park order (Doc. No. 1, Ex. B, § 1(f)):

2

[Defendant] shall not be obligated to accept orders submitted by [Plaintiff] but shall attempt to accept orders in good faith. . . . In respect to the contemplated Euro Park I order of 100 Mw, [Defendant] shall remit the initial pro-rata installment payment of Commissions to [Plaintiff] within five (5) days of the date when [Defendant] receives the initial deposit from the buyer, and the remaining Commissions shall be paid to [Plaintiff] in separate pro-rata installments within five (5) days of each date when [Defendant] receives a payment for a shipped portion of [Defendant's] Product. In respect to all purchase orders other than the Euro Park I order of 100 Mw, [Plaintiff] shall have no right to receive any pro-rata installment payment of its Commissions for orders procured by [Plaintiff] unless and until (i) the same are accepted by the [Defendant], (ii) a portion of [Defendant's] Product is shipped to the Customer, and (iii) payment with respect to the shipped portion of [Defendant's] Product is received by [Defendant].

Defendant and Euro Park never consummated the deal. Euro Park's officials did not visit Defendant's facility in February as planned, partly because a Euro Park official was ill, and partly because bank financing was skeptical of the project's viability (Doc. No. 1, ¶ 25). Euro Park's bank was allegedly wary because Defendant had failed to give Euro Park adequate assurances that its solar panels would achieve certain government certifications. Defendant and Euro Park continued to negotiate, and the visit to Defendant's facility was rescheduled several times (Doc. No. 1, ¶ 27). However, the visit never actually occurred, nor did Euro Park pay the initial deposit outlined in the Term Sheet, because Defendant never procured the proper certification for its panels.

Plaintiff alleges Defendant knew all along it would not be able to meet the technological certification standards for the Euro Park project (Doc. No. 1, ¶ 35). According to Plaintiff, Defendant used the Euro Park deal as evidence of its profitability in order to procure "tens of millions of dollars in assistance from the state of Ohio" and from other public and private investors (Doc. No. 1, ¶¶ 8-9). Plaintiff alleges Defendant repeatedly made false representations about its technological capabilities, both to Stripling and to potential investors.

3

## STANDARD OF REVIEW

When deciding a motion to dismiss under Federal Civil Rule 12(b)(6), the function of the court is to test the legal sufficiency of the complaint.  In scrutinizing a complaint, the court is required to accept the allegations stated in the complaint as true, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), while viewing the complaint in a light most favorable to the plaintiff.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir. 1976).  Although a complaint need not contain "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Thus, a complaint survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  And "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949).  This standard for Rule 12(b)(6) applies to "all civil actions."  *Id.* at n.4 (internal quotation omitted).

## DISCUSSION

Plaintiff claims Defendant breached the Agreement in two ways: (1) by failing to pay Plaintiff the commission on the "contemplated order" from Euro Park, and (2) by failing to use good faith in accepting the order from Euro Park (Doc. No. 1, ¶¶ 37-38; Hearing Tr. 22-23).

**Breach of Duty to Pay Commission**

Defendant argues it had no duty to pay Plaintiff a commission, because payment to Defendant from a buyer was a condition precedent to any commission obligation. Because the sale was not completed and Euro Park made no payment, contends Defendant, the condition precedent was not satisfied. Plaintiff argues the contractual provisions relating to payments by Euro Park merely establish a commission payment schedule, not a condition precedent to payment of the commission. According to Plaintiff, its right to the commission was established as soon as it presented a ready, willing, and able buyer in Euro Park.

Construction and interpretation of a written contract are questions of law. *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313 (1996). "The purpose of contract construction is to discover and effectuate the intent of the parties," and "the intent of the parties is presumed to reside in the language they chose to use in their agreement." *Id.* Further, the contract should be read "as a whole, and the intent of each party will be gathered from a consideration of the whole." *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 78 Ohio St. 3d 353, 361 (1997).

Here, the Agreement, read as a whole, does not support Plaintiff's argument that the commission was contractually guaranteed on the "contemplated order" from Euro Park. Rather, payment by Euro Park was a condition precedent to payment of the commission. A condition precedent "requires that an act must take place before a duty of performance of a promise arises." *Troha v. Troha*, 105 Ohio App. 3d 327, 334 (1995) (internal quotation omitted). "If the condition is not fulfilled, the parties are excused from performing." *Id.* Under the Agreement, payment by Euro Park must be construed as a condition precedent for two reasons.

5

First, the Agreement calculates Plaintiff's commissions based explicitly on *actual payments* by buyers, not on the amount of buyers' orders.  (*See* Doc. No. 1, Ex. B, § 2(a)) ("[T]he Commission shall be calculated and paid by [Defendant] to [Plaintiff] on the sales price *paid* by each [buyer.]").  In fact, the Agreement requires Plaintiff to return the commission if Defendant refunds any portion of the sales price to a buyer.  Clearly, then, the existence and amount of any commission (including the Euro Park commission) is predicated on Defendant's receipt of payments from a buyer.

Second, the Agreement provides that Plaintiff will not receive any commission "unless and until . . . a portion of [Defendant's] Product is shipped to the [buyer], and . . . payment with respect to the shipped portion of [Defendant's] Product is received by [Defendant]" (Doc. No. 1, Ex. B, § 1(f)).  The "unless and until" language makes *both* shipment of product *and* payment by Euro Park conditions precedent to payment of commissions.

Plaintiff correctly points out that the "unless and until" language does not apply directly to the Euro Park order, which is described separately in the Agreement.  But the Agreement's special treatment of the contemplated Euro Park order did not change the payment-by-buyers condition; it merely changed the shipment-of-product condition.  Specifically, the Agreement entitles Plaintiff to a portion of a commission within five days of Defendant receiving the initial deposit from Euro Park -- *before* any product was to be shipped to Euro Park.  The parties thus treated the Euro Park order differently than all other orders only in a very limited sense: commissions generally would require *both* shipment of product *and* payment by buyers, whereas the Euro Park commission would require only the latter.  Simply put, nothing in the Agreement indicates the parties intended to exempt the contemplated Euro Park order from the requirement that Defendant receive payment from a buyer before paying Plaintiff a commission.

6

Plaintiff argues that even if payment from Euro Park was a condition precedent, Plaintiff is still entitled to a commission under "established common law principles of contract and agency" (Doc. No. 9, p. 1). Specifically, Plaintiff asserts that "a broker who obtains a ready, willing, and able purchaser for a seller's product cannot be deprived of a commission when the seller's own conduct prevents the sale from being consummated." *Id.* However, the primary case on which Plaintiff relies, *Suter v. Farmers Fertilizer Co.*, 100 Ohio St. 403 (1919), does not support such a broad rule.

In *Suter*, a broker arranged a sale of sulphuric acid, and the buyer and seller entered into a binding, written agreement. The brokerage agreement called for a one percent commission, paid as payments were received by the seller. The buyer paid for several shipments of acid before disputes arose between the buyer and seller, who then negotiated a cash settlement and cancelled the remainder of the original sales contract. The broker claimed he was entitled to a commission on the entire amount of the original contract (rather than on the smaller cash settlement), and the court agreed. The court noted that "the contract of sale was complete[,] . . . the obligations of the parties . . . were fixed[,] . . . and there was nothing further for the [broker] to do." *Id.* at 409.

Unlike *Suter*, the instant case involves an unconsummated agreement, not a binding sales contract, between Defendant and Euro Park. The Agreement referred to the Euro Park transaction as a "contemplated order," a characterization entirely consistent with the preliminary Term Sheet signed by Defendant and Euro Park. The Term Sheet describes itself as an agreement to agree: "This draft term sheet shall be used as the term[s] and conditions of a [l]etter of intent to enter into a binding Purchase Agreement between the Seller and Buyer." An agreement to agree is binding and enforceable only if "the parties have manifested an intention to be bound by its terms[.]" *Normandy Place Assocs. v. Beyer*, 2 Ohio St. 3d 102, 105 (1982).

7

Here, the Term Sheet, though it contained essential contract terms such as quantity and price, reflected the intent to *not* be a binding contract.  First, the Term Sheet explicitly provided that the parties would enter into a binding agreement *in the future*, indicating that the Term Sheet itself was not binding.  Second, Euro Park wanted to visit Defendant's facility to assure itself of Defendant's ability to meet the required specifications.  This is not a case where the buyer was at the table, ready to sign the contract; rather, Euro Park would not consent to be bound until after its visit to Defendant's facility (which, it turns out, never occurred).  Because the Complaint does not set forth a binding contract between Defendant and Euro Park, *Suter* is not controlling.

Plaintiff also cites a number of cases from the real estate context holding that brokers are entitled to a commission once they produce a willing buyer.  *See, e.g.*, *Scott v. Cravaack*, 53 Ohio App. 2d 248, 250-51 (1977) (holding that when seller of a motel refused to permit a buyer to sign the sales contract, the broker was still entitled to a commission for procuring a ready, willing, and able buyer).  Even assuming those cases apply beyond the real estate context, they would be unavailing, for two reasons.  First, the Agreement did not call for a ready, willing, and able buyer; instead, it called for actual payment by the buyer.  Second, Euro Park was not a ready, willing, and able buyer, because, as explained above, it was not yet ready to sign a binding contract.  Thus, the real estate cases cited by Plaintiff do not support its position.

**Breach of Duty of Good Faith**

Plaintiff's alternate theory is that Defendant did not attempt to accept the Euro Park order in good faith, as it was obligated to do under the Agreement.  Although the Agreement does not explicitly define "good faith," Ohio law generally defines good faith performance as "'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'"

8

*See Littlejohn v. Parrish*, 163 Ohio App. 3d 456, 463 (2005) (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)).  Further, "'lack of good faith is the equivalent of bad faith, and bad faith . . . imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.'" *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St. 3d 272, 276 (1983) (quoting *Slater v. Motorists Mut. Ins. Co.*, 174 Ohio St. 148, paragraph 2 of syllabus (1962)).[1]

Defendant argues that Plaintiff's allegations, if proven, would not establish bad faith, because Defendant continued to negotiate with Euro Park for several months after the parties missed the initial deadline for completing the deal.  This willingness to negotiate, argues Defendant, shows that Defendant was actively trying to complete the deal.  Thus, according to Defendant, any allegation that Defendant approached the Euro Park deal in bad faith is implausible.

Defendant ignores the thrust of Plaintiff's theory.  Plaintiff alleges that Defendant knew all along that it would not be able to manufacture solar panels to Euro Park's specifications, yet it needed the appearance of a pending sale in order to drum up financing.  Under Plaintiff's theory, the Euro Park deal was never more than a hollow showpiece.  Defendant's continued negotiations with Euro Park (the basis of Defendant's implausibility argument) are actually consistent with Plaintiff's theory, as the appearance of an interested buyer was critical to obtaining public grants and private investment.

---

[1]

Plaintiff counsel's suggestion that "good faith" requires "best efforts" (Tr. 27-28) is incompatible with this definition.  Good faith and best efforts are two different standards, with different meanings.  *See, e.g.*, 17B C.J.S. *Contracts* § 561 (explaining that good faith may be a component of fulfilling a separate obligation to use best efforts in performing a contract).  Here, the Agreement imposes no duty to use best efforts, only a duty of good faith.

Moreover, the Complaint presents Plaintiff's theory in some detail.  Plaintiff alleges precisely those specifications and government certifications required for the Euro Park deal, along with details about grant applications referencing the Euro Park deal.  Thus, Plaintiff provides more than conclusory allegations and clears the *Twombly* hurdle.[2]  As suggested at the Hearing (Tr. 34), until testimony from Euro Park is introduced, the merits of this claim, while suspect, cannot be dismissed at this stage of the lawsuit.  A claim meets the *Twombly* standard even when "'a recovery is very remote and unlikely.'"  550 U.S. 544, 556 (2007) (quoting *Scheurer v. Rhodes*, 416 U.S. 232, 236 (1974)).

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is granted as to Plaintiff's breach of duty to pay commission claim, and denied as to Plaintiff's breach of duty of good faith claim.

IT IS SO ORDERED.

                                     _____*s/ Jack Zouhary*_____
                                     JACK ZOUHARY
                                     U. S. DISTRICT JUDGE

                                     May 25, 2010

---

[2] This Court notes that if Plaintiff eventually proves its breach of good faith claim, it would not necessarily be entitled to the full commission.  Damages for breach of contract are generally limited to those which are the "natural result of a breach[.]"  *Brown v. Spitzer Chevrolet Co.*, 181 Ohio App. 3d 642, 656 (2009) (internal quotation omitted).  In this case, it is doubtful Plaintiff suffered $14.9 million in damages as a "natural result" of Defendant's alleged breach of its duty of good faith, particularly since Defendant had no obligation to accept any orders submitted by Plaintiff.  Depending on the evidence, some other measure of damages may be applicable, such as out-of-pocket costs for negotiating the deal with Euro Park.  Further, contrary to defense counsel's suggestion at the Hearing (Tr. 30-31), Plaintiff has not waived any alternate claim for damages. Though Plaintiff's counsel did assert that the appropriate measure of damages for breach of good faith is the full commission, he never conceded there was no other possible measure of damages (Tr. 29).  The Complaint itself requests both payment of the commission and "such other relief as the Court deems appropriate" (Doc. No. 1, ¶ 39).  In any event, the measure of damages is a question that need only be answered if and when Plaintiff is able to prove its bad faith claim.